Good morning and honors, Doug Burton from Kellogg's Spark Club Int'l. We're at Council Tables in Clinton. I'd like to reserve two minutes for a rebuttal, and now for something completely different. Spark Club, in this case, wants to breach the issue through discovery, summary judgment, or trial of whether, under the Pike test, the burdens on interstate commerce that we have alleged outweigh the punitive interest of the state. And before we get there, to get to that test, there's hurdles. There's ways to get there. The district court judged some of them, but not another. So I'd like to talk about that first, and then talk about our allegations and our complaint about the burdens of interstate commerce in the state's interest. For a couple of different future-related reasons why Pike applies here. The first, which the district court did not address, is where the activity at issue here, the importation of mountain lions into California, and the movement of hunters to go hunt those in other states, whether that is an activity that Congress can regulate, and that's the Conservation Force demanding case. In other cases, this sort of sets the floor of the impact that has to be there, because if Congress couldn't regulate it, the Commerce Clause, the normal Commerce Clause, is not developed at all. The state concedes, in their appellate brief, that Congress could regulate these activities, and they don't dispute that Conservation Force applies. They said the district court didn't raise this issue. Interrelated to that is what kind of showing do you have to make? Look at this like a ceiling. If you don't allege enough of the impact of interstate commerce, then you're not going to outweigh anything. The National Optometrist case talks about that, and I'll address this factually shortly in a minute, but I want to address the issue that's being raised by the Senate Council. Mr. Judge Gould, if I could just clarify something, and correct me if I'm wrong, but I thought if your client could not allege a substantial burden on interstate commerce, that we don't get to the pike balancing piece. The balancing of benefits against burden only arises when there's an adequate showing of burden. In some sense, substantial enough. I think what the district court did in error was that he saw our allegations as merely talking about lost profits, getting to our factual allocations. The key point is that Californians that want to go to other states and hunt mountain lions to bring their trophy back to California, they would be fulfilling unused quotas. This is in our amended complaint. So there are mountain lions out there that are not being hunted. The states want to, the other states want to be hunted for their management purposes, and they're not being hunted. So when Californians go there, they would be creating new commerce. It's not a shifting of commerce from one business to another. It's not how you have to run a business to operate. Right. Counsel, could you address the substantiality of the burden in the record that's been presented? Yes, let's say one person says, let's say one person only says, boy, I would go fly to the neighboring state and hunt mountain lions and ship my trophy back here if I could. Now, could one person be substantial burden? Well, that would be a more difficult case than we have here, because what our first round of complaint alleges is that there are thousands of Californians with this desire. Now, for the preparation of our complaints, we surveyed our start coaching members, and we have, I think, about 4,000 in California. A large number of them responded with positive. Some of them have already printed in other states and want to bring back their trophy. Of course, they can't. You didn't really get a full survey of the states. You surveyed a small number of your members, and you established a business. Yes, exactly. That's what we did for purposes of preparing our complaints, stating our claims. What we would do if we could go to discovery experts, teams of experts, is that experts would do a broader survey of Californians, get a sense of how many hunters in California would, and other states, have hunted. Do you think, though, that's a little bit speculative for breeding purposes, to say you examined a few of your members and you could take from that? Do you think that's a little bit speculative? Well, we surveyed 4,000 of our members. We got a small response, and we tried to get some sense from the public information out there how many hunters there are in California, and our members are representative of the people that hunt. So, I don't think it was overly speculative to say that a large number of Californians have a desire to hunt mountain lions in other states and bring their trophy back. I'm going to ask you to distinguish or use your argument as to why our case is dealing with farm-bribe strike offenses, because you remember, I don't remember the names, but I remember the names of the products they bought. It seems as though the claim to burden on interstate commerce that would be involved in those cases, where we can't use farm-bribes anymore, that might really be probably greater than it is here, because I've had a hard time seeing how your case could advance in the face of those two precedents that we have. Well, the Foie Gras case was supported by the French Association as a result, and that involved a ban on the importation of Foie Gras. There was a complete ban, because if they produced it without forcing anything, they could import it. In that case, the court looked at the person that was alleged by the plaintiffs and said that they overstated it because they could import other parts of the duck. Like I said, they could import Foie Gras, and that was produced in other ways. And their allegation was, finally, that it was overstated. Of course, that's too much. What we've alleged is an impact based on the cost of mountain lion hunting that is not occurring because of the import ban of something somewhere around $15 million. And we'd like to get to discovery experts to better quantify that. But do you think this is just a matter of our court setting some dollar floor? Are you going to be above? If between 5 and, you know, 5 is not enough, but maybe 15 is, I mean, that's where we end up with here. No, no, it's the judges exercising their expertise, looking at both the burdens, alleged kinds of burdens. You know, this is a big article for the same comers, which, you know, a lot of cases talk about. They're concerned about state regulations that impact this flow of goods. That's what we're talking about. And the burden, so you look at what kind of law it is, and you look at what kind of impact services people are not traveling, not getting health centers for these folks. And I don't think it's where I get stuck. I mean, just to be honest with you, though, this seems to be like your claim to conform, because if your claim to conform, then it seems to me no state can ever be permitted to ban outright the possession of a particular article, whatever it might be. You know, states can make all sorts of judgments, moral or otherwise, about the desirability of people having certain things, right? And the only way you're going to, you know, make that kind of ban comprehensive is to say, not only can you not possess it in the state, but we're not going to let you bring it in from another state. And people are always going to deal with that by saying, well, hey, I would have traveled out to another state. I would have bought it. I would have brought it back in. There's all sorts of commerce involved in that, right? And so it seems to me we rule in your favor that this is the end of states having the authority to ban certain undesirable articles in their documentaries. Well, I don't agree for two reasons. One is I think we have a lot of impacts on commerce that will not happen. Again, it's not like the Exxon case or the Commerz case where the commerce is being shifted around between businesses. This is interstate commerce that is not happening. That's the first point. The second is under the pike balancing, you have to, as I speak, clearly overweigh the state's purpose. And I have to interject my concern or question. When can we ever get to pike balancing? And that's because I have a question in my mind. If it's reasonable to assume that the percentage of the general public in California interested in hunting mountain lions is similar to the percentage of surveyed responses of members of the safari club. Why would we think those percentages would be comparable? Well, just to clarify, the comparison was safari club members to what we tried to understand was the number of hunters in California, not the general population. I understand that the safari club is not representative of the general population that desired to hunt a mountain lion, but we believe it is representative of the desire of people in the hunting community. Let me take your spin on that. Why would we think the percentage of hunters in general would be the same as the percentage of safari club members, like some guy who shoots quail, would want to go shoot a mountain lion? Well, safari club hunters are of all types, and it's not going to be a precise solution, but it's generally representative, in our view, of the desires of the hunting community. And if we can get to discovery, we can hire experts to survey it and get more concrete about this. In all the estimations that I've given, preparing a complaint of very conservative, I didn't assume that the general hunting community would have the same percentage of desire to do this as safari club members, but I think it's reasonable to conclude that they would have some similar desire, some similar percentage, that it's going to be a very large number of hunters that have this desire, and over time would fill these quotas that are not being filled to create this loss of commerce. Thanks. If I could just get back to your point, there are some hurdles regarding whether it's a burden. It's only applicable when the activity is something entirely natural, or requires a uniform system of regulation or is discriminatory. Now, not all the cases require this. The case that's sort of most on point is the Pacific Northwest case, which was a ban on deportation of live wildlife. And that court looked at it, said there's no discrimination, there's no need for uniformity, and then it looked at the allegations that the plaintiffs in that case had made. So it got to the balancing part, and now it's on summary adjustment, that most of these cases are on summary adjustment, where the plaintiff has the chance to generate the information that will give more concreteness to your concern. That court weighed the burden against the state's interests. The state's interests were very strong in that case. They're documented scientifically, documented in the statute. But that plaintiff shouldn't be able to escape it. I think what Safari Club has lost is far greater. Right now, there are many complaints, and we seek to have that weighed against the state's interests, which, if I can be real quick about it. The question is the state's interests, I know. Yes. You know, it's to help wildlife and habitat in California. Well, hunting in other states doesn't advance that interest. The interest about animal cruelty was not reflected in statutory purposes that were voted on. It's not in the legislative analysis of that proposition. It's the biased opinion of people that are, frankly, into hunting. So I don't think that's a strong interest. It's not in the statute, which that's where you should look for punitive interest of the state in these cases. Okay. Thank you very much for that. Thank you. Let's hear from the other agency. Good morning. May it please the Court. Alexander Robert Gordon on behalf of Defendant Accomplice. So plaintiff has failed, even after amendment, to state a plausible claim for realty-inverted commerce clause. And just to take a step back, to be clear, what the commerce clause is concerned with is not, which is what the allegations that plaintiff has made would suggest, having the greatest amount of commerce. It is not concerned with an effect on commerce. It is not concerned, as it thinks, with a loss of commerce. It's concerned primarily with avoiding economic protectionism, with avoiding discrimination, and with avoiding states' attempts to interfere with interested commerce that require uniformity and should be regulated nationally. That's not the case here. That's kind of where I'm at. But I want to make sure. Does our case longer support that? Because that would suggest that even if they came back and said, you know what, the number is $100 million. And we've already, I mean, I'm really giving you discovery from you to figure out these numbers. They can do their own research. But let's say they actually had it documented down to the tenth, that the impact was $100 million annually. Yeah, that's enough. It's $200 million, $300 million. Or are you just saying, you know what, as far as I'm concerned, it doesn't matter. You can come back with a million dollars, and that's not going to help you because of the principle that you just articulated. It's not discriminatory. There doesn't need to be a national, there's no need for national uniformity with respect to how you discriminate. We want to put it that way. So where are you asking us to go? I am asking you to stay exactly where this court has been, and where it has been in trying to document with the association, which is the Sharpe-Finn case, and where it has been in the National Association of Optometrists, and where it has been in the Foie Gras case, among others, which is to say that the dollar amount ended up itself as relevant. So if the dollar amount were to tell us there were a billion dollars, that in and of itself doesn't matter. But if it were, such as in Pike, the dollar amount started to tell us that this was really hidden discrimination, that this was really the state trying to afford benefits for itself at the expense of out-of-state suppliers, then that could tell you something that would be a problem. In and of itself, though, the number of hunters, the dollar amount, all sorts of things that Safari Club is already a discovery on, really don't speak to whether this violates the numbers clause. So you think our case law is already at the point where we say, so the thing that Safari Club chooses, you either need to show some kind of discrimination in favor of in-state interests, or interference with some kind of international uniformity. If you can't, you shouldn't over-adjudge either of those. You were just out of luck. You can come in with whatever dollars you want. It's not going to matter if that's where you say our case law is. So let me unpack that. So I would say basically, yes. And then I'm going to give you, I'm going to explain why. I'm going to give you a paragraph to say yes. So yes, that is where the case law is right now. So international optometrists have repeated and tied it to the neighborhood association. The court says, look, most laws that are struck down under Pike are done so because they're really discriminatory. And then there's a small number that are struck down in case they require national uniformity. Like the trucks, absolutely. Railroad, you know, on farms, right? These are the cases that are struck down. So the court says that. And the court also says, which is why I think most squarely within its jurisprudence, that the fact on Congress, right? I mean, so, okay, so you ban sea bears, shark fin. You can't have them. You can't sell them. You can't trade them. That has an effect. And it has a dollar effect. And plaintiffs actually allege that, right? The court says, well, but the ban isn't discriminatory. You can't have shark fin for anywhere. Not like you can have California shark fin, but not Tennessee. We're okay. Right? And so because you're talking about your effect, there is no burden on interstate comers. And so we don't even have to go to Pike. I would like you to comment on whether the cases that you're relying on, like the shark fin case, whether they did a Pike balancing analysis, or whether they just said there's no substantial burden on comers, so that's the end of it. So both National Autonomous and shark fin absolutely did not do Pike balancing, said you do not have a substantial burden. If there's no substantial burden that follows, it can't be clearly excessive, right? We have nothing to weigh on the state's punitive interests against, so we're not doing it. So that is the state of the law. To get back to my caveat on this day, the case law of National Autonomous said these cases, this small number of cases, when it's talking about a national uniformity, generally include. Now, I read that generally to its head, right? So it means it is possible that there could be some other kind of case that's not about discrimination or not about need for national uniformity. This isn't it. I don't know. But what we know it isn't, right, is it isn't coming in and saying, as plaintiffs have done here, this is the heart of the allegation, right? The amount, this is paragraph 46. The amount that these hunters would expend on activities they cannot do or are not willing to do because of their outlying position represents a substantial adverse impact on interstate commerce. Well, even if that's true, that's okay, because that's not a substantial burden on interstate commerce. And so under this court's very clear case law, the claim fails right there. It cannot go any further. There's simply nothing to balance. Even if this court were to apply a cake balancing, this statute would survive because it's already said that the state has legitimate interests in preservation of its wildlife, protecting the environment, and in preventing animal cruelty. So the court certainly could apply a cake, and you wouldn't get to a deferred conclusion. There would still be no claim, no plausible claim for relief. But it doesn't have to. So even if the court were to concede any basis for that statute, you should not be able to say whether or not it just contains the interest of the courts that that was necessary. To be clear, I do not think that the court should or needs to utter its own precedent. I'm simply saying it wouldn't change the result if it did. So to make sure that I have sort of hit everything here that I want to, just to be clear again, just to talk about a few of the points that the Voting Council has raised. In terms of the district court not addressing whether Congress can regulate its meaningless meeting, we'll concede that Congress can regulate commerce in mountain-like parts, right? Congress can regulate whether it's commerce or pretty much everything. Including, apparently, farmers using their own meat to make bread and it was held to fall within the commerce power, but that doesn't mean that that is a substantial burden. Those are two completely different inquiries. Counsel, when I was in law school, when a professor talked about whippered beef, some student in the class who was from a farming family stood up and almost cried out, you mean we can't eat our own wheat? No. Well, if I read that case correctly, I think it means that they can. It just means it's within Congress's power to sort of discuss that, to discuss that question. Okay, well, in any event, let me ask this from the state's point of view. Would it be desirable for our law to say that in this type of case, we should be looking towards bike balancing? Or would it be desirable to say that the matter should be resolved at the substantial burden stage? I realize we're constrained by prior circuit precedent, but I'd like to know your position on that. So my position is that, as you've suggested, you spoke at prior circuit precedent, is that there's no substantial burden. And I think there's an excellent reason for that, which is if the courts of the state had to go to bike balancing every time there was any kind of an effect on commerce or regulation, you'd constantly be reviewing state determinations, right, because you expect everything's going to have an effect. It has to be, given what the commerce clause is concerned with, a substantial burden. And I think it's also very much in keeping with the idea that, you know, bike has sort of been construed as a rational basis kind of review. And under that kind of review, the state, and in this case the people, enjoy tremendous deference to their judgments. So the fact that some people may disagree or think that this isn't true or that it could be written better is not considered under rational basis and it shouldn't be considered here. So I think it is all in keeping with this court's precedent, with this court's precedent, that if, in fact, there's no substantial burden as that is meant under the commerce clause, is that a claim that we do not go any further? Thank you. If the panel has nothing further, I can sit down. Yeah. You're probably standing up. You are just about to get up. Okay, good. Okay. Let's give you two minutes for a moment. Thank you. I'd like to read something from the second optometrist case about the corollary concern of the Dormant Commerce Clause is that, quote, this nation is a common market in which state lines can obfuscate barriers to the free flow of both raw materials and finished goods. I think that's been expanded to all commerce and people moving in commerce. So it's not just about discrimination in favor of skewed employment. It's a primary concern. The optometrist case, the reason that's different, as I was saying, is because that was about shifting commerce around. I'm talking about lost commerce. And when there is lost commerce, there is a burden on the interstate market. It's not functioning as it should because commerce is being eliminated and not happening. Regarding the animal cruelty statute, I mean, animal cruelty purpose, the district court did not rule in the context of the commerce clause that animal cruelty was the purpose of the import ban. He ruled under, as you know, the Equal Protection. It's any conceivable reason to support distinctions between classes. As far as whether this would open the doors to every kind of regulation being subject to PIPE, no, it would not. This is an import ban that affects the interstate movement of commerce, it affects the movement of people across state lines and them spending money. It's also a case where we have bounties that the state has a strong interest expressed in the statute that would be hard to outweigh. People are not going to be bringing a lawsuit. So am I wrong in my assumption that every single import ban would implicate the exact concern you've raised here and all someone would need to do and then we're, hey, we're off to the races and the state has to come in and justify it. And, you know, those are bounties in such a strict sense, not where the law is right now. Well, if there was any purpose served by this import ban, like I said, the council, like you said, the purpose is to protect habitat and wildlife in California. They've never explained how. So that's going to eliminate a lot of such lawsuits because a lot of the species is threatened, endangered species. This one, mountain lions are abundant everywhere. I don't think the state needs to have any other interest in them. Morally, we think killing mountain lions is bad to the extent we can help reduce the number of mountain lions that get killed all the time. But that's never been, it's not the statutory purposes. If you look at the statute, the Supreme Court case recites, citing says, look to the statute itself when the purposes are expressed. Yeah, absolutely. I hear you. When I was passing, it was my hypothetical, like every single import ban, any part of it, whether it be the animal, anything that the state just decides for just purely moral reasons, we just don't think that this is, you know, something that we want our people to be trafficking in. So nobody can possess it in our state, and no one can bring it in from another state. And it's always going to have the exact same impact on interstate commerce that you're alleging. And it just seems to me, it's a, I don't know, maybe it's $10 million, maybe it's $15 million, maybe it's only $100 million in some other case, but no state could defend, or no state could certainly, you know, avoid the whole-time penalty inquiry. Then you'd have someone like yourself saying, well, the moral interest of the state as a servant is worthless, so there shouldn't be given any money. I just don't think that's what federal courts are supposed to be doing in this area. Well, I don't think that has happened. There's the case regarding the law of wildlife, you know, that was 20 years ago. There's not a whole lot of cases where it's a outright ban on a product. That's my point. I think that the reason we don't have a lot of cases like that is because nobody has accepted the argument that you're putting on these people for us, and if we were to do so, I just can't think of any import ban anywhere that would not be vulnerable to the exact same challenge from your opinion. If it has a significant impact, when you say commerce, but you know as well, because everyone will always say, I would travel to go get that thing, and I incurred enough cost to bring it back, right? And as long as it was an article in wide enough circulation, someone's always going to be able to get about $15 million to guarantee that. Right? You have someone, you come in and say that's a $20 impact, and I see where you're staying, but you're all the way down to $15 million, and you say that's good enough. What import bans is not vulnerable? Well, I don't see a lot of them. There are a lot of these import bans that have no purpose behind them. I mean, that's the limiting factor that is different. If we had seen a strong purpose, we would have second thought about this. But this import ban, it's one word in this proposition, and then mostly to do with other things that have caused this problem for the last 20 years, and it's going to go on indefinitely because it's very hard to amend other initiatives. If we had seen in the statute, the reason for this is we want, we think map hunting is cruel. We want to discourage Californians from going there and spending their money in other places by banning imports. We probably wouldn't have brought this case. No purpose is supported by this ban. It can be a humble, plurally purpose. It's not something you can easily assign to the purpose behind this law. Okay, thank you very much for your argument. I think it was just a very good one. We've seen it, and we will take it into another recess.
judges: Gould, Watford, Sands